IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| James J. McCoy, Jr., )<br>  )<br>          Plaintiff, )<br>  )<br>vs. )<br>  )<br>Jo Anne B. Barnhart, )<br>Commissioner of Social Security, )<br>  )<br>          Defendant. )<br>_____ ) | Civil Action No. 6:05-3186-CMC-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On September 24, 2002, the plaintiff filed an application for DIB alleging disability beginning March 3, 2002. The application was denied initially and on reconsideration. On January 21, 2004, the plaintiff requested a hearing, which was held on April 21, 2005. Following the hearing, at which the plaintiff, without the assistance of counsel, and a vocational expert appeared, the administrative law judge considered the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

case *de novo*, and on July 12, 2005, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on September 23, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)  The claimant meets the nondisabi!ity requirements for a period of disability and Disability Insurance Benefits set forth in Section 21 60) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)  The claimant has not engaged in substantial gainful activity since the alleged onset of disability March 3, 2002.
>
> (3)  The claimant has the following medically determinable impairment(s): hypertension, osteoarthritis, asthma, a cardiac condition, and depression.
>
> (4)  The claimant does not have any impairment or combination of impairments that significantly limit his ability to perform basic work-related activities; therefore, the claimant does not have a "severe" impairment (20 CFR § 404.1520).
>
> (5)  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(c)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

>impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 59 years old at the time he allegedly became disabled and 62 years old at the time of the ALJ's decision. He has a high school education and prior work experience as an assembly line worker, machine operator, and fork lift driver. The plaintiff alleges he became disabled on March 3, 2002, due high blood pressure and shortness of breath (Tr. 83). The record reveals the plaintiff has a history of hypertension since October 24, 2001 (Tr. 152).

In April 2002, one month after the plaintiff's alleged onset of disability, Dr. Robert L. Elder noted that he had "some mild" dyspnea and that his blood pressure was 140/94. Dr. Elder ordered a refill on the plaintiff's Altace (antihypertensive) medication (Tr. 151). Three months later, in July 2002, the plaintiff denied any shortness of breath or "other problems," and his blood pressure was 140/88 (Tr. 150).

On August 30, 2002, the plaintiff told Dr. Elder that he had some abdominal pain and swelling, lower back pain with spasms, and shortness of breath after lifting watermelons. His blood pressure was 140/90. Dr. Elder diagnosed the plaintiff with dyspnea with an abnormal electrocardiogram and lower back pain; however, the echocardiogram performed on August 30, 2003, showed normal left ventricular systolic function with diastolic dysfunction (Tr. 138, 149).

On September 16, 2002, the plaintiff's blood pressure was 142/100, and he had diminished breath sounds on right side of his chest. He was diagnosed with pneumonia. Dr. Elder documented no assessment or plan regarding the plaintiff's blood pressure (Tr. 148). Later that month, on September 24, 2002, Dr. Elder wrote a "To Whom It May Concern" letter stating that the plaintiff was currently unable to work secondary to pain and pulmonary nodules. He stated a workup would be completed within one week (Tr. 147).

On September 27, 2002, a chest x-ray showed the plaintiff's asbestos-related pleural disease was stable (Tr. 153).

On October 16, 2002, the plaintiff complained of "mild" chest pain and reported that his blood pressure went up whenever he got upset. His blood pressure was 138/90. Dr. Elder diagnosed the plaintiff with "labile" hypertension "likely" secondary to getting upset. Dr. Elder also prescribed Zoloft (an antidepressant) for mood swings (Tr. 146).

On October 22, 2002, the plaintiff underwent a cardiac consultation performed by Robert E. Quinlan, D.O. Examination showed normal heartbeat, blood pressure 130/90, regular heart rhythm and sound, no edema, and no vascular insufficiency. An electrocardiogram was normal overall. Dr. Quinlan opined that the plaintiff had a "relatively normal appearing" electrocardiogram and "reasonable" blood pressure. Dr. Quinlan opined that given the result of a stress test, the plaintiff was cleared from a cardiovascular standpoint, but needed more antihypertensive therapy. Dr. Quinlan noted that the plaintiff's blood pressure "m[ight]" accelerate whenever he was active (Tr. 133-34).

In November 2002, the plaintiff denied any chest pain or shortness of breath. He told Dr. Elder that Zoloft helped his mood swings. His blood pressure was 130/90 (Tr. 145).

The following month, in December 2002, Dr. Elder noted the plaintiff was doing "well" and that he did not have any chest pain or shortness of breath. His blood pressure was 150/80, and Dr. Elder opined that the plaintiff's hypertensive cardiovascular disease was stable (Tr. 144).

On December 30, 2002, the plaintiff underwent a psychological evaluation performed by Al B. Harley, Jr., Ph.D., at the request of the State agency. The plaintiff told Dr. Harley that being impatient was a major problem which interfered with his ability to work. He told Dr. Harley that he was no longer taking Zoloft. Dr. Harley noted that the plaintiff's concentration was variable, there was no evidence of impaired reality testing, and that he walked, cooked, shopped, went to church, did odd jobs around the house, and visited family and friends. He indicated that he never received any psychiatric treatment at a mental health clinic or hospital. He also stated that he last worked in "February 2002" due to a lay off. Examination showed normal range of intelligence, the ability to perform serial 7s without difficulty, the ability to recall three items after 10 minutes, but the inability to interpret abstract and relevant "fashion." His thought processes were normal, and he stated that he

"really did not worry about anything much." Dr. Harley diagnosed adjustment disorder with depression, hypertension, and mild change in employability. Dr. Harley also assigned a Global Assessment of Functioning (GAF)[2] score of 53, indicating moderate difficulties. Dr. Harley concluded that the plaintiff had no neurotic or psychotic trends, was mildly impaired in his ability to relate to others, mildly restricted in his daily activities, and mildly constricted in his though processes (Tr. 129-31).

On January 17, 2003, Edward D. Waller, Ph.D., a State agency psychological consultant, reviewed the plaintiff's records and completed a Psychiatric Review Technique form (PRTF). Dr. Waller opined that the plaintiff did not have a severe mental impairment. He found that the plaintiff had only mild limitations in the areas of restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 171, 81).

Treatment notes from Dr. Elder dated February 14, 2003, indicated that the plaintiff was still doing "well" and that he denied any problems. His blood pressure was 136/80 (Tr. 143).

In March 2003, Dr. Elder noted that the plaintiff had "some" intermittent dyspnea, that his blood pressure fluctuated "a lot," and that he had intermittent headaches. His blood pressure was 140/82, his lungs were clear, and his pulmonary function test showed borderline obstruction. Dr. Elder noted that a Cardolite test performed the previous year was negative. Dr. Elder prescribed Advair (a corticosteroid bronchodilator) (Tr. 141).

On April 2, 2003, the plaintiff reported to Dr. Elder that the Advair helped a little, but he was still having shortness of breath. Dr. Elder noted that the plaintiff's chest x-ray showed marked cardiomegaly, and that his blood pressure was 112/80.

---

[2]A GAF score between 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peer or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th Ed. 1994).

7

echocardiogram indicated that Plaintiff had a "[] normal study for [his] age." There was mild left atrial dilation and diastolic dysfunction of the left ventricle; however, the left ventricular function was normal (Tr.132, 140).

On September 4, 2003, the plaintiff returned to Dr. Elder for a follow-up for his hypertension and breathing problems. Dr. Elder noted that the plaintiff was doing "well." His blood pressure was 140/70. Dr. Elder scheduled a follow-up appointment in six months. However, the record does not show that the plaintiff kept his follow-up appointment (Tr. 139).

In October 2003, a pulmonary function test was normal (Tr. 164).

In a "Report of Contact" dated October 24, 2003, the plaintiff denied having depression, but stated he became frustrated when he could not remember things. He stated that he handled his finances, but ,for the past year, he had forgotten to pay some bills. He attended church 2 to 3 times a week and could follow the sermon. He stated that he could watch about 1½ hours of television shows per day and explain the plot. He reported that he crushed his foot in an industrial accident in 1998 and that his toes and ankle were painful in cold weather. He testified that he could stand about 4-5 minutes and sit for 10-12 minutes. He stated he could ride in a car for one hour and did not use a cane (Tr. 117).

At the hearing on April 21, 2005, the plaintiff testified that his last day at work was March 3, 2002, because there was a "big shutdown" (Tr. 35). He testified that he was laid off and received unemployment benefits for six months (Tr. 35). The plaintiff testified that his problems were high blood pressure, troubles with memory, shortness of breath, and crying (Tr. 36, 44). He also stated that he took medication for his prostate (Tr. 37). He testified that he took medication for hypertension and depression (Tr. 38).

With regard to his daily activities, the plaintiff testified that he took care of three foster children (ages 9 months, 11 years, and 14 years) (Tr. 39-40). He was

independent in his personal care, cooked small meals, drove, and sometimes cut the grass (Tr. 40-41).  He also stated that, on a regular basis, he visited friends, family, and attended church (Tr. 41).  He claimed he could walk and stand 25-30 minutes before needing to sit, and that he could lift and/or carry 20-25 pounds on a regular basis.

## ANALYSIS

The ALJ found that the plaintiff's impairments were not severe at the second step of the sequential evaluation process.  The plaintiff argues that this finding is not based on substantial evidence and that the decision should be reversed and the plaintiff found disabled.  In the alternative, the plaintiff argues that the matter should be remanded for another hearing.  "'[A]n impairment can be considered as "not severe" only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"  *Evans v.* Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)).  The regulations state:

> **What we mean by an impairment(s) that is not severe.**
> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §404.1521.

The ALJ's finding that the plaintiff did not suffer from severe impairments is not supported by substantial evidence. Medical evidence demonstrates that the plaintiff has hypertension, for which he took medications including Levaquin and Altace (Tr. 90). The plaintiff testified that when his blood pressure was elevated he frequently lost his balance, and people near him would grab him to keep him from falling (Tr. 36). He testified that he had trouble breathing and had to take Advair. He testified that he had worked around asbestos, and he believed this caused his breathing problems (Tr. 44). On September 16, 2002, a chest x-ray revealed that the plaintiff's heart appeared to be enlarged, the pulmonary vascularity was mildly congested, and there were some nodular densities in the mid lung zones anteriorly (Tr. 154). On September 24, 2002, the plaintiff's treating physician, Dr. Elder, stated that the plaintiff was "currently unable to work secondary to chest pain and evaluation for pulmonary nodules with his chest pain" (Tr. 147). On October 16, 2002, Dr. Elder that the plaintiff had "labile hypertension, likely secondary to when he gets upset and his pressure goes up" (Tr. 146). In a treadmill stress test on October 22, 2002, the plaintiff's blood pressure rose to 204/100 by the second stage of exercise. Dr. Quinlan noted that the plaintiff needed more hypertensive therapy because his exertional dyspnea (difficulty in breathing) could be brought on by his blood pressure accelerating when he is active (Tr. 134). A CT scan on December 12, 2002, showed the plaintiff had asbestos related pleural disease (Tr. 153).

The plaintiff also testified that he had difficulty walking or standing for longer than 25 to 30 minutes, and he had difficulty lifting and carrying things. In an August 30, 2002, office visit, Dr. Elder diagnosed the plaintiff with low back pain and prescribed Vioxx and Shelaxin (Tr. 149). X-rays of his lumbar spine on that same date disclosed multi-level schmorle's nodes and loss of disc height at L1-2, L2-3, L3-4, L4-5, and L5-S1. The impression of the radiologist was lumbar spondylosis (Tr. 155).

Based upon the foregoing, substantial evidence does not support the ALJ's finding that the plaintiff does not suffer from a severe impairment or combination of impairments. Accordingly, it is recommended that the decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings and consideration of the plaintiff's claim beginning at step three of the sequential evaluation process.

                          s/William M. Catoe
                          United States Magistrate Judge

August 3, 2006

Greenville, South Carolina